Cases 19-2280, 19-2281, 19-2354, and 20-1235, United States of America v. Corey Bailey and others. Oral argument not to exceed 30 minutes to be shared by defendants, 30 minutes per plaintiff. Craig Alvindaley for the appellant. You may proceed. Good morning. Good morning. Can you hear me clearly if I leave my mask on? Yes, you're welcome to take it off, but if you want to leave it on, that's fine as well. Thank you. Craig Daly on behalf of Corey Bailey. I've indicated that I want two minutes for rebuttal. Thank you. Yeah. In the short time that I have, I want to address the jury instruction issue that the court asked us to address, and also because this is an issue that's common to all the defendants in this case. At the insistence of the government, the district judge included the words, or conspirator in all of the predicate state and federal crimes. And they did so for all of those racketeering acts or crimes, both in terms of the intent to commit those crimes as well as the acts themselves. Would eliminating the or a conspirator language, as you all requested below, suggest that the jury may need to find that the defendant committed the racketeering act? I mean, that's what I didn't understand from your briefs, if you take out or a conspirator, what's left? What is left are the substantive crimes as defined by Michigan law and federal law and aiding and abetting. So not only did the district judge instruct with the words or conspirator for each substantive offense, but also for the inchoate crimes for attempt. Do you have the instruction in front? I'm sorry? Do you have the instruction in front of you? I don't, but I think I know what it says. You're talking about, just so we're clear, for a particular defendant and at least one other conspirator. We agree that's fine. Agreed that the defendant or a conspirator would engage in a pattern of racketeering. Yeah, we're not talking about the racketeering instruction per se. We're talking about the substantive racketeering acts. So a 962 C. But isn't it true that if, tell me where I'm misunderstanding. Isn't it true that if a defendant or a conspirator, this is how I read the charge conference as to what the judge was saying, committed the racketeering act, that would be enough? So that's the agreement, which is a separate element from the substantive crimes. In order to have a reconspiracy, a defendant has to agree to the commission of substantive offenses, if completed, would constitute the reconspiracy. So in other words, if the jury is not properly instructed on the substantive offenses, then you're not going to have the completion that would constitute a reconspiracy. Does that make sense? So what the government did is they combined the agreement portion with a separate element of the substantive offenses. So if, as what happened in this case, if the jury is instructed. But you're not, are you, just, I'm sorry if I don't understand this. It's not easy to understand. It's sort of, Judge Stafford, quite heady in the sense that it's trying to separate the elements out between the agreement and what the substantive offenses are. So let me give you a hypothetical that may help. What would happen if the district judge, in a conspiracy for a bank robbery, told the jury that the bank robbery crime, the agreement to commit that crime, was two people who walked into a bank and walked out? You would say that you can't conspire to commit something that's not a crime. So in this case, when we talk about premeditated murder, assault with intent of murder, all of the controlled substances, if the jury is allowed to find that the defendant didn't intend the crime, didn't do anything, didn't act, didn't have knowledge, there's no substantive offense, no predicate offense. And that's what Salinas teaches us. It has to be, if completed, there would be a 1962C violation. Does that help at all? Yes, but he's not – so what the government's claiming, right, you're not talking about – I get you're talking about the substantive offenses under the RICO conspiracy itself. Correct. Correct? Yes, under a deed, yes. So let me just play it out without talking about the instructions. If – let me use two defendants. If Bailey commits a murder, okay, just assume my hypothetical. Bailey commits murder in furtherance of the RICO conspiracy. Is that enough if Shai agrees that Bailey should commit the murder for Shai to be responsible under RICO? So, Judge Stafford, there's two ways in which you can commit a predicate offense. The first example that you used were Corey Bailey himself commits a crime or he agrees that somebody else commits the crime. Yes, but, again, that's the agreement. Don't confuse the agreement with the substantive offenses that have to be committed. Are you talking – this is where I'm confused, and I'm sorry if I missed this. Are you talking about being guilty for the conspiracy itself, or are you complaining that because of this instruction we shouldn't have been guilty for the conspiracy itself, or are you complaining because of this instruction my guy shouldn't be guilty of the actual whatever it was, this murder? Okay, so those are two separate questions. I know, but I want an answer to each real quick. The answer to both is they're both wrong for this reason. Account one is the conspiracy under RICO, so if the predicate acts aren't properly instructed legally, then you can't be convicted on an illegal theory under Skilling. If you go to the Vicar Counts, in order to get a conviction for a Vicar Count where the defendant is actually charged with the murder, they have to prove a 1962 C violation, right? They have to prove an enterprise, racketeering activity, and that affects interstate commerce. What happened here is when they got to racketeering activity on the Vicar Count, the district judge told them, use the definition that I gave you for racketeering activity in count one. So we get back to that count one again, and we have the same problem. The district judge has to instruct them on what the substantive predicate acts are according to Michigan law and according to federal law. Okay, we understand that. I think I understand your argument. Any questions? No. Thank you very much. Thank you, counsel. Good morning. My name is Mark Magidson. I represent Orlando Shire. The issue that I'm going to address before the court this morning is commonly known as the Remmer issue. That is to say, we believe that the trial court erred in denying our motions for Remmer hearing and or a new trial. Defendants, in fact, filed two post-judgment motions for Remmer hearing. Counsel, because your time is limited, can I cut to the chase on this? Okay, so what I'm struggling with is what's the test for internal versus external. And I think a lot of the things in the affidavits as I read them are, to me, internal. But you need to explain to me why they're not, right? Because we both agree if they're internal, you can't get them through the gauntlet. If they're external, they're fair game. Right, so you're right. Much of what's in the affidavit is internal. And the things, even the misrepresentations on the questionnaires, these are things that are internal. So what is external in the affidavit basically comes down to two things. There's a, in the affidavit, it was shown, at least suspected, that the juror, who was at issue here, used, referenced a newspaper article. Okay, so let's talk about that, because I agree with you, that's external if it happened. Right. But why, all, when I read it, and you probably don't have the affidavit in front of you, nor do you need it because you know this well, but when I read the affidavit, and I'm going to go to the specific paragraph, it appeared to me, so it appeared, that blank and another juror, meaning this juror B or whichever one they are, read the Detroit News article about the seven mild bloods because in jury deliberations, they were stating facts about the seven mild bloods that were not presented in evidence. And after trial, I read the article, and then I saw how they get those facts. But it appears to me, isn't that speculation? And is that enough? I mean, what do we do in that circumstance? I think that it's enough to get an inquiry, particularly when combined with what we knew, is that she also referenced a strip club and said where the location was. That was never part of the record. So if you look at that. You know, your brief's really good on this issue, and I commend you for that. But that, to me, the strip club, where I struggle with that, as we all know, like I know where the local Walmart is. What you're going to do, it's ironic we're up here, and now you're talking about this local versus suburban divide. But I saw a question that you referenced in your brief about how the defense attorney, one of the defense attorneys was saying, look, a lot of you come from all over the state. Like, are you going to have a bias? We want local juries. I mean, that is the whole point of the jury system. And we're all going to know where things are located within our community. Well, that's true, Judge. For instance, everybody knows where the Carl Stokes Federal Building is. However, not everybody in Cleveland knows where the 007 Strip Club is. And the fact that this juror was able to identify that, it wasn't a common public building. But the fact that she knew that, it wasn't her community. I mean, that doesn't prove externalness, does it? No, it doesn't. And I've got to say, and I will admit that the affidavit is the lesser of the two evils that we wanted to address. Because the more significant thing is the ‑‑ because I don't think there's any quibbling as to what occurred in terms of jury intrusion on three different occasions when, number one, the marshal at the very beginning of the case gave out a cell phone number and said to the jury, among other things, contact me if there are any threats. This is a one‑on‑one. Well, he gave a string of things. If you're late, if you're having car troubles, if you receive threats. But isn't that a standard thing that marshals say? I mean, if you have a run out of gas, if you get a flat tire. But if you receive threats, that bell rings loud. That resonates with the jury. What effect does that have on the jury when the jury is told, if you receive threats, what does that effect have? I don't know. The second thing is, we had a situation where ‑‑ I'm sorry. Tell me if I'm wrong. But don't you have to do more than speculate? I mean, in other words, don't you have to say, received threats, resulted in, and we've got an affidavit juror wise saying, that influenced me in thinking these were bad guys. Does that make sense? Well, yes, it makes sense. But here's what happens. We do know that there was a marshal who told the jury, among other things, call me if there are threats. We know that. So that was an intrusion upon the jury. So that's one thing. The other thing is, is that we have a juror who sent two text messages to the marshal. And the supervisor then, based on that, told the judge, here's how we handle this. I'm going to go and interrogate or interview this juror. And he did that for about five or six minutes. And then that juror or the judge concluded, oh, well, I guess everything must be okay, because the marshal concluded that it was okay. And the judge had his law clerk more or less supervise that interaction. And then so what is the effect of that? What happens when that juror is called out of the jury room? And then what is the effect of the other jurors when that juror comes back? Can you walk me through that? So the juror says there may be some conspiracy with the group, right? Right. The text says, yes, that's right. We think there's some conspiracy within the group. Meaning within the jurors, right? Well, supposedly we don't really know, but we're speculating. And what the marshal asked is, is there any tampering? And the juror just says, no, we're just frustrated. Well, we don't, I mean, to that extent, we have the report. But what is the, here's what we do know. What was it that you would have wanted to have happen? Would you want him to be brought before the judge and the judge do it? Or what's the gripe from your end? Or should we have just ignored the message? No, I agree. No, you can't do that. I think Remmer tells us what to do, because we had a very similar thing here, where somebody, a juror complained about something. I thought Remmer was an FBI agent investigating. Well, okay, but here we have a marshal. But they were investigating with the prosecutor outside the presence of the defense, right? So that seems much more problematic than a marshal clarifying what the remark meant. But both are official people going and. . . You agree, that's, I mean, on a magnitude thing, that's different. Well, I mean, I suppose, but I don't think that a juror would see it any different. A marshal's got a uniform on. But, counsel, here the court knew about it and approved it. It wasn't the marshal on a frolic and detour. That's why I ask you, what did you think should have. . . What would you say should have been done? Okay, what should have been done is what Remmer says. You have to conduct a hearing in open court and allow the parties to have input on this. So at the very least, the juror can be brought out. This matter could be discussed in open court with the parties. And let the defense counsel at least satisfy themselves that there's no other impartial improper proceedings that are going on. The court then informed the parties afterwards. And they could raise whatever motions they wanted. Right, exactly. So the court informed the parties on the 23rd what occurred on the 21st. So it was two days later. And then there was a concern, particularly by the government, who said, you know, we need to get a report done as to what occurred here. And then that's when the judge later obtained a report that we received, not that day, but sometime later, maybe a week or so later. So it wasn't until then. And then, yes, we did file the Remmer motion. And then there was another invasion or another intrusion as well when the jury was deliberating. And the marshal goes in there and says, tamp it down. Be quiet. You're making too much noise. We can hear you in the courtroom. So what effect does that have? I mean, that seems to me to be the weakest of the three because, I mean, telling a jury to quiet down. I mean, I was a district judge. I had 100 trials. I mean, juries got boisterous and you don't want everyone to hear their deliberations. So judges will say, can you go tell them to keep it down? And that happens all the time. And the speculation in the affidavit is, well, it didn't affect me. And your other affidavit says, well, it didn't affect me. But one jury got quieter. That can be for we. That's pure speculation. But we don't know. And the quiet down can go either way, too. Right. But we don't know. And we have all these things that are extraneous things, intrusions upon the jury. Are you saying that's an extreme? You're saying this court should hold a marshal telling the jury to keep it down is an extreme is an extraneous thing that affects the jury verdict. Well, when a marshal comes in and tells them to basically shut up and calm down, it orders them because he's a marshal, as opposed to the judge calling the jury out and saying, look. You know, that seems more intrusive. But just tell it. Go tell them to keep it down. There's an instruction that could be read. We have to be civil. You have to respect each other's opinions. You know, the instruction that could have been used to have a marshal go in there and exert authority over this jury, I think, was in a proper improper intrusion into this jury. Counsel, you seem to be arguing any time there's an interaction between the marshal and the jury that that warrants a rumor. No. What is the line here? What what is the rule then for what a marshal should be doing with respect to a juror? Whenever there is a colorable claim of influence from the outside, then the judge is obligated. Rummer tells us that that it's presumed to be prejudicial. Are you saying that Marshall should shouldn't? I mean, I'm trying to think of practical things here. Marshall shouldn't have given them his cell phone number. Is that what you're arguing? I'm not arguing that I'm arguing. Are you arguing that the marshal should not have gone into the jurors room? I'm arguing that a marshal when the marshal says, if you get threats, contact me. That to me drops a drop of ink in a gallon of milk. It's tainted. You've already put that jury on notice that these are bad guys, that they are capable of anything, including threatening a federal jury. So that's why I believe that. I wanted to know what the effect of that marshal saying those words was on that jury. I don't know what the effect is. I do know it happened. And your argument is that the cumulative effect of all of these alleged errors warrants a rumor hearing. There's not one particular thing that you're saying warranted a rumor hearing. That's correct. Any other questions? Thank you very much, counsel, for your thoughtful argument. Appreciate it. Good morning, your honors. May it please the court. I'm Court Gatterdam here on Robert Brown's behalf. I'm focusing today on the case agent question, the second assignment of error in our brief. And we believe it was error to admit the opinion testimony of a non-expert, Vicente Ruiz, and it was not harmless. Agent Ruiz testified five times at the very beginning of the trial, the end of the trial. Why wouldn't we apply plain error? Well, I think there was an objection by counsel for shy to the agent Ruiz test of interpreting symbols. And I see the court. Let me I saw that in your brief. One, you say injection to interpretation. That sounds like a 701 objection to me. And B, the second one is a narrative objection. You're going to have to explain to me how those are objection. Judge, he's not qualified. Because you go from those objections to the next section of your brief where it says, no, we're really objecting to the qualifications. That, to me, when attorneys object to the qualifications, they say, Judge, this person isn't qualified to opine on X. And you are really experienced defense attorneys and objection to the interpretation. Now, go ahead. I can read you your exact objection. I hear you, Judge. OK. The narrative objection, I'm not relying on that. I pointed it out because it was an objection. It said stop testifying to narrative. You agree. That's not objection. He's not qualified. That's objection. Make this witness be quiet so someone can ask a question. Agreed. OK. So the interpretation of symbols, though, underscores his entire testimony. But let me read what you said below. Actually, it's shy's counsel. But as you noted, they apply to everyone. Judge, I'm going to object. This is his interpretation. Now, listen to the next sentence. Somebody could see it differently. I object to the subjective interpretation. Not to the qualifications. He's not qualified. He's looking at images. He's making a seven sign or whatever he's making. And someone could see it differently. And what the judge says is whatever the judge says. Well, he's looking at this. The jury can look at this. You can look at it. And you can cross on it. But here's the guy who sits in the courtroom during the entire trial, testifies five times. He's the expert to the jury. He's telling them. So then why not object on his qualifications? Why not say this guy isn't qualified? He shouldn't be an expert in this case. Where is that in here? Because I couldn't find it. It's not. And it should be. OK. How can we hear the objection at all, given isn't that a fact-bound determination? I mean, haven't you just waived it completely by not raising it before the district court? I think it's subject to plain error, Your Honor. I certainly think it affects substantially. But how can we engage in fact-finding as to whether or not the guy is qualified? Well, you can certainly look at the record as to what he was testifying to and determine whether that is expert-type testimony, which it is. It's not just saying we, the police, did this. We did search warrants. We found this. We found that. It's saying, hey, when they put that 7 up, that has meaning. That has 7-mile bloods all over it. And then it's just the leap. It's one little more leap from a gang to an enterprise. And that's what the government was trying to do. But this happens all the time. The question is, what you're saying is, the jury could make these leaps. But what your real beef now is, is this guy wasn't qualified. And what Judge Bush asked you is, how do we know at this point? Because you didn't object below such that his qualifications could be put in the record so we can review it and say, yeah, he wasn't qualified to make this. I agree. That's a problem. But I don't think that means you can't review the issue on the record because he did testify to his qualifications at the very beginning of his testimony, five years in the gang squad. This case has all the earmarks of Ledbetter from the District Court in Columbus where they said, look, this is not your maiden voyage. There's no evidence he's ever testified before in another gang case. Remind me, was Ledbetter a plain error case? It was. I thought they objected. Your Honor, it was a pretrial motion. I only say it because I was trial counsel who raised the motion pretrial. We had a hearing. And I know that's what you're saying, like that's what should have happened. But it doesn't – there's so much in this record. And maybe defense counsel believe, well, the government never gave us a report, so they're not calling them as experts. Here's my worries. What you're asking after the fact, after a month-long trial, after all this stuff, I'm just going to be candid with you, is a judge to sua sponte, interject themselves, and say this guy is not qualified to opine on this because not a single defense attorney said it. And so now you've got four really good defense attorneys. None of them are raising it below. You're asking a judge to interject. Now, here's the flip side to that. If we require judges to interject, let's say you as a defense attorney, I could see this strategy. We want to get up in closing and say, this guy just got up and opined, but we didn't hear about his qualifications. We didn't hear about this. We didn't hear how he knows this. We didn't hear – defense attorneys do that all the time very effectively. Now you're allowing a judge to interject at the detriment of the defense because then what's the government going to do? They're going to drive the semi through the hole that was just opened, and they're going to go through how this guy might have been undercover, how this guy learned the gang symbols, how he did all this stuff, just in the qualification realm. And so that's the problem you create is you're asking judges to go from being neutral observers in trial to active players interjecting in the defense. Well, Your Honor, I certainly think the judge, without prejudicing the jury, could call a sidebar and say, this certainly sounds to me like he's giving expert testimony here. I don't – I understand you're saying activists, but they are to control the evidence before the court, and this is not – But you and I both know unobjected to, for example, hearsay. Unobjected to hearsay is admissible. And so what is the key there? Unobjected to. And so the point is what we want judges to do is wait for an objection, especially when you have four qualified defense attorneys that could raise this if they were concerned about it. Well, the government's never claimed this was some trial strategy, and I think you have a record, enough of a record, and it dovetails into our third assignment that this witness testified five times. He was testifying throughout the entire trial. So that's the impact that he had on this jury, and he's directing a verdict. He's 704-ing the jury, saying, hey, the ultimate issue, all these symbols, all these signs that I'm telling you what they mean, it's a gang and it's an enterprise. Directed verdict. Listen to me. I'm your friend. I'm in court every day. That's what they're doing. That's why I agree with everything the court is asking me, but you have enough of a record to say this was wrong. Thank you. Any other questions? Thank you very much, counsel. Much appreciated. Yes. Good morning. Good morning, Ms. Oakley. May I please support? My name is Karen Oakley, and I represent Keith-On Porter. My issue that I want to raise is that the phone records were not properly admitted. The only thing that ties Keith-On Porter to the Seven Mile Blood Gang is the phone, this one phone, which the number for that phone was 313-806-0837. In a previous trial, that phone was attributed to Eugene Fisher. And then when the police ñ let me back up. There was a controlled buy with Keith-On Porter and Detective Ruiz. Okay, and in that controlled buy, Detective Ruiz was texting somebody, which was Keith-On, but he wasn't texting this 313-806-0837 number.  When Keith-On was arrested in that controlled buy, they never recovered. They didn't even take Keith-On's phone, the phone that he had that he was texting. They recovered over 50 phones, I believe. And in recovering over 50 phones, they looked at Corey Bailey's phone, and that had a number in it that was this 313-806 number that they tried to attribute to Keith-On. They also looked ñ Can I ask you one question? So correct me if I'm wrong. In Bailey's records, right, it's KP. Yes. And the question ñ one of your objections is a relevance objection, but that's a really low bar. And so KP matches the initials, and so why wouldn't they be admissible as to 401 at least? Well, for one, KP testified ñ I'm sorry, Corey Bailey testified that he didn't even know Keith-On Porter. But that just goes to the right weight to place on it. So then the jury can say, okay, KP isn't. Right, but let me be clear. When you go through all the other ñ like Anthony Lovejoy, Malia Scott, Derek Kennedy, all of these people did not know Keith-On. Actually, I'll be more ñ I get it, but can I ask ñ sorry to interrupt you, but doesn't ñ again, back to my question. So let's say you have really good evidence, and this is what the government has. That's just ñ like, go ahead. But the phone is also used to pinpoint Keith-On's location. Well, if the phone doesn't belong to him, then pinpointing his location is an error. Plus, I don't believe the ñ Detective Ruiz had a warrant. And I know that in the Carpenter case, if you want to use the cell phone location, you have to have a warrant for that because there is an expectation of privacy. Well, the phone that they use, they use it to locate, to say that Mr. Porter was in a specific area. There's no warrant that they use to get those cell phone location towers. This occurred before the Carpenter decision, correct? Yes, it did. It did. So couldn't the officers in good faith rely upon the law as it stood in Carpenter? I think the officers can rely on the law. But I also think that it's important to note they never even looked at the phone that was on Keith-On Porter. They never ñ they were unable to ñ they got a warrant to download it, and they never downloaded it. The phone that was on Mr. Porter was destroyed. I guess what I'm struggling with, and I hate to keep coming back to this, is why isn't this all for the jury? Like, in other words, your argument is really effective. For a jury. The question is, why should we, a court, intervene and say, well, this isn't relevant under 401? Because the district court's looking at it at the time to make a snapshot decision there. And now we're coming in after the fact and saying, look at all this other evidence that points the other way. Well, the district court doesn't know that until that evidence comes in. And that's something you can argue in front of the jury. And, in fact, what you're arguing is very effective. Yes, Your Honor. But I think it's important to note when you have a trial that has 19 defendants total, I think when you hear ñ the jury hears all the evidence, it starts to ñ even I had trouble keeping track of who was who. So I started doing a flow chart as to who was who. And I'm a lawyer. And so the jury ñ I know they had a difficult time. And I think Mr. Porter just got swept in with the rest of the people. I mean, if you have ñ and, again, Detective Ruiz testified several times throughout this proceeding. And if, as counsel said, you're using his testimony like he's the expert, which, you know, then when he says that phone is tied to Keithon Porter and starts talking about the cell phone towers and his location, the obvious thing is Keithon lives in that area. So if you did look at his cell phone, he lived in that area. And just by living in that area doesn't make you a member of the Seven Mile Bloods. But all of that was attributed to Keithon. And I know that Carpenter case was not the law at the time. But in the transcripts, the judge does reference the fact that the Carpenter case at that time was before the Supreme Court. So I believe ñ But we came out the other way, right? Yeah. Any further questions? Thank you. Thank you very much. Good morning, Your Honors. My name is Dan Hurley, and I represent the United States. Unless the Court prefers otherwise, I'll go in reverse order just to start with Ms. Oakley's arguments. Obviously, this Court did come out the other way with respect to the Carpenter issue in the Carpenter case itself. And so there's no basis to throw out the cell phone records. The good faith argument, I think, carries the day. Ms. Oakley said that Mr. Porter got swept up in the mass of people or the five defendants at trial. He didn't get swept up. Derek Kennedy testified that he talked to Porter after a shooting and that Porter was claiming he was the one that spotted the rival's car. He was the one that summoned Arnold and Shy to the scene. Porter's the one who said, I shot him up before the others even got to start shooting. So Porter didn't get swept up. Kennedy said Porter admitted that he committed that shooting. And so it's an argument for the jury, but it's not a basis for this Court to throw out those phone records. It's particularly true because just the part you referenced that obviously the initials are KP. There's more than that. Government exhibit, I think it was 19F. There was a cell phone video where a group of individuals who associate with SMB were in a room and they're rapping and singing. And Billy Arnold, the shooter, is holding up his cell phone. And he says something like Lorenzo TV. And he kind of pans the room and he identifies there's this guy, there's that guy, there's that guy. And this is an incident where they rap and laugh about shooting someone that EYE. Which is an obvious reference. Which of the defendants that are before us are on that rap video? Well, the most important one is Porter. Because when… Arnold else on the rap video? I think Shy was there, but I'm not certain of that, Your Honor. But the important one is Porter. So Billy Arnold was panning the room and he's saying there's this guy, there's that guy, there's this guy, there's that guy. And he turns to his left and there's Keethon Porter. And the jury could see this on the video. And Billy Arnold says, there's KP. We got KP. So the jury knew that they referred to him as KP. So it's not just the inference, well, his initials are KP. The jury saw they called him KP. So when two separate phones show the initials KP, or as some cell phones do, last name first, PK, that this was his number. Under the very low bar for admissibility, there was more than enough evidence for the district court to let these phone records in against Mr. Porter. Turning to the argument about Agent Ruiz's testimony. There's no question this is plain error. These defense attorneys made opinion testimony objections. Mr. Magidson, at another point in the record. Do you agree his testimony crossed the line into expert testimony? I don't. Why not? I mean, I especially don't agree that it's plain error. Well, set aside plain error for a second. The vast majority of the agent's testimony consisted of, who's this? Who's that? The guy on the left is shy. The guy with four fingers down. But what they're objecting to is the symbols, the things he was opining on. And from what I can see, and you should correct me if I'm wrong, nowhere in this record is there quali... Like, you never put in, like, affirmatively other... Yeah, he's in the gang squad. He's doing this. But why? He can opine on these things. In other words, he was undercover with the gang. He has some special knowledge. All the things we usually require. So that is true, and that is a function of the fact that there was no objection. I mean, I agree. I mean, usually you affirmatively put those things in so a jury can tell, can use that to... Go ahead. I'm sorry, Your Honor. I don't mean to interrupt you. You're not. I don't think he was giving opinion testimony in the 702 sense. He wasn't saying... And the defense is, oh, his testimony amounted to a conviction that there was an enterprise. The agent never said that. What he said was, this is this guy. The guy with five fingers up is this guy. The guy doing this, showing the letter B. I mean, that's a B. And there's no expert qualifications necessary to say, that's someone holding up the letter B. That's his testimony over and over again. Picture is shown. A video is shown. An agent says, a person with five fingers up, that's Devin McClure. That's Block. The person with four fingers down, that's Shy. That's Arnold. The person with the mask, that's Billy Arnold. That's not opinion testimony that requires the qualifications under Rule 702. It's just not. And I think the Ewing case that the defense relies on kind of shows that. When an agent testifies, this person made this sign, and only a higher person in the gang is allowed to make that sign, well, then I agree. They're putting substantive, specialized knowledge about the gang in play. All the agent did was descriptive. Who's who? Who's doing this? Now, it's true that. Go ahead. Well, I will concede that there were times when the agent didn't just say there are four fingers pointing down. The agent called it dropping four. But Derrick Kennedy testified, a member of the enterprise. I mean, the dropping four, those things are getting to it, right? Kennedy and Lovejoy, their credibility was attacked pretty, I mean. Not on these points, though, Your Honor. I mean, the reality is the reason the government didn't qualify this guy, the agent, as an expert was because none of this was in doubt. There's no argument that there's not a red zone. Shy has a tattoo that says seven-mile blood. Bailey has a tattoo that says red zone across his abdomen. Their videos show graffiti with red zone in the background. Eugene Fisher, another defendant at trial, is making posts saying here are the boundaries of the real red zone that the street needs to know. There was no argument that there was or wasn't a red zone. There was no argument that these guys didn't call themselves SMB. Shy made posts showing himself and Billy Arnold and I think Devin McClure. His caption was something like SMB bosses. They referred to themselves as members of SMB. They referred to themselves as 55. So there was no argument at trial that, oh, there is no such thing. There was no argument that there were roles. The government did not make any argument in closing about, well, as Agent Ruiz told you, when somebody does this, it means that's not what the trial was about. The trial was, was there enough structure, was there enough common purpose and relationships to form an enterprise? So what about the Rummer hearing? Why don't you move on to that? I mean, I have problems with the marshals saying if you receive threats, because that does imply something to me, that these are bad guys. Well, I think it might, but I want to correct the record. I think Mr. Magus and said that the marshal said when you receive threats, and that's not what he's saying. I didn't hear him say that. What I heard him say is if you receive threats. So the marshals give us, this is a standard explanation to the jury. If you have any trouble, if you have a flat tire, if you get sick, if there's something going on, here's a phone number called. Nobody said. All of that's fine. The words are received threats. And I think that is a two edged sword, because if the marshals don't say, hey, if anybody gets hassled, then the jury knows to contact the marshals. I mean, everyone in America knows if a jury is tampered with, you should contact the marshals. And so it seems to me that at the very least is an extra. What's the harm with once that comes to light, asking the jury, did that influence you in any way? I don't know that there's a harm other than this came to light while the jury was deliberating. So this was not something that came to light after the fact. The fact the marshals giving the phone number came to light in the context of the court telling the defense attorneys and the prosecution. There was this incident where one of the marshals, I'm sorry, one of the jurors did reach out and make a reference to a conspiracy. And so the court said, I had a marshal go in and ask what. Your friend on the other side says, why not call that? I don't know. I can't remember if he said call the whole jury. But what I would have. Why not just call that juror out when the defense counsel president and the government president allow the judge to ask what's going on. The short answer is nobody asked for it. They learned of this several days before the verdict was actually reached. The court told them, look, I'm telling you now, this happened. Somebody said there was something about a conspiracy. Here's the marshal's report. And there was no request for an inquiry. And I also think there's an even better answer. These attorneys had the two juror F and juror L. They had unfettered access to them for months after the trial. The one affidavit was signed December 15th. The Rummer motion wasn't filed until mid-February. If there was anything about this, why isn't it in the affidavit? What more could they ask? Why is there any reason for the district court to think, oh, juror L, juror F might have heard something. There might have been some discussion. Can I ask you where you would draw the internal-external line? So I will agree it's not an easy line. But I think the Supreme Court in the Orger v. Showers case makes clear information that a juror carries with them when they come to the courthouse, that's internal. So what if this juror, the graffiti juror, let's call her that for now. What if the graffiti juror had information that the graffiti was SMB, we run the red zone? Okay, that's internal. She brought it to the courthouse under your test. Is that problematic? That is not a proper basis to raise this issue on an affidavit from another juror. Well, how else do you raise it? Well, if she was making posts, for example, after the trial. So if that juror made a Facebook post and said, you bet I convicted them, I knew from the start, then you can use that evidence. So 606 doesn't say… Well, why wouldn't that be internal information? I think it is. So under your test, that's internal, but they can use it because she posted versus a juror testified to it or asked for to it? I don't think there's a basis to overturn the verdict. No, no, but my point is you're saying you're not changing the internal, external line. You're saying that internal information can be used to impeach the verdict if it comes from a Facebook post versus an affidavit. And I'm trying to understand why that's relevant. So I don't think it's an adequate basis to impeach the verdict. What I'm saying is the question here is whether they could raise this issue through affidavits. And 606 and Warger say they can't. What if what she brought is she… So she saw before the verdict, and I'm just going to pick one of these gentlemen, shoot and kill someone else. And she knew that, shows up, does what she does. You read Shai's brief. Does what she does and doesn't respond to any of the questions. Gets to jury deliberation, says these are bad guys. We've got to convict them. Convicts them. That's under your test. Personal experience, internal. Yep. Can't come in? It's not my test you're under. It's the Supreme Court's test. Warger says as plainly as can be, that's internal. They cited cases where a doctor brought specialized medical knowledge. Well, what they say is internal matters include the general body of experiences that jurors are understood to bring with them to the jury room. Okay? That's not crystal clear. But then let me give you this qualifier. When they're talking about now this is an accident case, Whipple's daughter's accident may well have informed her general views about negligence. But it did not provide either her or the rest of the jury with any specific knowledge regarding Shower's collision with Warger. Now, go back to my example, which I realize isn't this case. I'm just trying to figure out where the line is. My example is murder. She observes a murder. By one of the defendants. Wouldn't that be specific knowledge about this case? I mean, don't you have to concede that that falls in the exception Warger created? I don't. I think Warger is pretty clear saying you can't use affidavits from other jurors about what is discussed in deliberations to challenge the verdict or to show that a juror lied in voir dire. Warger says that. Is the difference because earlier there was some discussion about suppose she posted on Facebook after the trial. In that case, could you use that? Because then it wouldn't be from affidavits. It would be the juror herself saying, in effect, I was biased or I brought this up or whatever. That's exactly right. And at that point, the district court can have a hearing and decide whether the juror lied. And if the juror did lie, should there be a new trial? So that the line we're drawing is not whether a juror. The affidavit versus what I'm having a problem with. It's not the affidavit versus the Facebook post. In other words, if another juror became friends with this juror and then after trial, she said the same things that were in the Facebook post. What you're drawing the line is internal juror deliberations versus things done after the fact that aren't the deliberations themselves. Minor standing with 606 is you cannot have an affidavit from a testimony from one juror. Attested putting forward facts that came out in deliberations to show in deliberations. That's right. So what you're saying is the Facebook post is not in deliberations. That's right. It's not that it's a Facebook post because it could be an affidavit from another juror if they become friends. And after the deliberation, she says, I'm glad we convicted those guys because here's what I saw before we ever got to trial. That could come in. I think so. I haven't actually thought about it because, as you acknowledge, that that's very far removed from this case. But but let me go back. Why isn't that internal under your test? In other words, I'm trying to figure out where this line is. So the problem is internal. There's two layers to this and they never get past the first layer. There's we don't get to the whether it's internal because it's all coming from one juror describing another juror. And so that's internal. So if a juror says she went out and looked up on Facebook, she read all of the Facebook posts, she read the Instagram posts of the defendants. That's extraneous information. It still has to also be prejudicial. Only the newspaper article gets through that that door that Werger and Rule 606. So you can see the newspaper article is external. The newspaper article is external. So why shouldn't the court at least have brought the jurors in and say, did you read this article during deliberation? Two reasons, Your Honor. The first is that there's no basis. It can't be more than just, well, I didn't remember the facts in testimony that that this other juror was saying. So it must be that she read some unidentified article. That's not enough. If juror V said, here's what the papers say. Well, then I think that is potentially problematic. But we don't even know what facts she said. So the thing you just said might be would be if, you know, the Detroit News says, you know, breaking flash, Robert Brown, you know, killed somebody in California last year. And then the juror says, you know, we never heard any of that at trial. The only reason I heard it was that the lady said Robert Brown killed somebody in California last year. And that she read it in the paper. But we don't know. Well, would she even have to? She'd have to say what the fact was. The only reason is that there's a decent inference that it came from the paper. That is, in my hypothetical, it definitely wasn't in testimony. And it doesn't appear that there's any other reason to know it. Would that at least get you into a hearing? I think the answer is probably. But we don't have that. Again, they wrote the affidavit. They sat with these jurors. They wrote the affidavit. And it doesn't say what the information is. How is the district judge supposed to decide, oh, this troubles me. I should have a hearing. Or I don't have any idea what this is. There's no specification. The juror heard Robert Brown killed somebody, Corey Bailey. There's nothing. And it's not enough that it be outside information. It has to be prejudicial information under Rule 606. And there's no basis for the district court to have any idea, is it prejudicial? Because there's nothing there. There's no fact. And it's not enough. I don't think the district judge should be doing a Remmer hearing on the basis of one juror saying another juror talked about something that I don't remember being evident. Well, there were two, right? Well, the second juror only talked about, as I recall, the affidavit was the generalized she used outside information, but they were clearly thinking of the juror's internal information in terms of I've seen the red zone graffiti. I know the effects of gangs in the city in a way the suburban jurors don't. And so I don't think it goes that far. Only one juror specifically made reference to a Detroit news article. And she didn't make reference to anybody admitting reading it or specific facts. And they certainly didn't show that there was any prospect of prejudicial information being used in the jury room. The fact that a juror doesn't remember an unknown fact in evidence, that can't be a basis for Remmer hearing because the Supreme Court has made clear over and over again, especially in Warburg, these are not things that we should just jump into. There are strong institutional reasons not to be getting into deliberation. Why isn't the graffiti related to the enterprise? I'm sorry. Why isn't the seven mile blood graffiti related to the enterprise such that it could fall in the exception of in that word or seem to at least allude to. To the extent the jurors, we don't know whether she saw us, you know, seven mile blood equals whatever, but I would have two answers. One that's internal, your honor, that is information she brought in in the same way that she knows where the Walmart is. She knows how the buses run in Detroit. If she's seen that. Let me read this, but it did not provide her the rest of the jury with any specific knowledge regarding showers collision with Warburg. Now let me rephrase it, but it provided your acts, whatever V, whatever they're calling her with specific knowledge about the enterprise. So two things. One, I don't agree. Our position has never the SMB equals enterprise. There's a whole lot more to that. I guess three things. My second point is again, this was never disputed. Shy has tattoos. Bailey has tattoos. The Facebook posts, they couldn't be more obvious. This is a red zone. This is SMB. This is what they do. Johnny Jones talked about it. Derek Kennedy talked about it. Lovejoy talked about it. Lee Scott talked about it. There's never an argument about whether, was there an SMB? Was there an enterprise? I mean, was there a red zone? Was there this 55? That's just not in dispute. But I also, I don't think it's external or extraneous information. If she saw it before trial, then the way to weed that out is to ask about it in voir dire. But she didn't answer the question. The question wasn't, have you ever seen red zone graffiti? I understand, but they had offense. Shy puts all these questions in his brief at like page 39 or something. And there were tons of questions asked. Do you have any familiarity? With this gang? The question wasn't. And she did. She admitted in deliberations allegedly that she had familiarity. Having seen graffiti is not the same as I have familiarity with the gang, the workings of the gang, what it means to be in the gang, what the gang was involved in. She didn't say, I know these guys committed these crimes. I know these guys sold drugs. Having seen graffiti. She stated that she had seen, this is, I'm reading paragraph seven. She had from the affidavit. She stated that she had seen graffiti of the seven mild bloods painted on buildings, either in her neighborhood or in adjacent neighborhoods. That's not external. No, no, no. But my only point is you're saying that way to handle this is in four deer. Shouldn't she have admitted she had some familiarity with them. If she in fact said that. Perhaps, but again, this affidavits off limits. To challenge her answers in Vardir. We're going to be showers is explicit about that. If the court's fine on that issue or has no more questions, I would turn to the, or a conspirator issue. I will confess. I'm still not sure I understand the argument. There's no question under Salinas that nobody needs to have committed a predicate active racketeering. That's just black letter law. The district court said the defendant or a conspirator could commit a predicate act. What about this argument? This is, let me give a twist to one way I could understand it, which is you also convicted them of predicate acts. Right. Yeah. Could the jury misunderstand that they didn't themselves have to commit the predicate act to be guilty of it? Does that make sense? It does, but I don't think that's how the instructions read. The instructions for the substantive offenses, for example, I think it was count to the murder one for Corey Bailey. They said the defendant killed somebody. The defendant intended to kill. The killing was premeditated. The only reference there is to the defendant himself doing the act, having the intent. It's a very strange reading of the instructions to say that somehow by referring to the enterprise, that loop back to something that somehow allows someone else to have the intent. The court couldn't have been more clear. That's what the instruction, that's what, that's what the elements were. The defendant killed somebody and intended to kill them and premeditated the killing. And so that substantive conviction stands. The same is true with respect to assault with intent to murder. The other point I want to make is- Your statement is that under Salinas, the pure agreement that something would happen doesn't require that it happen and it doesn't require that either you or the person that you agreed with do it. That's right. And if that seems tough, it's just, that's what RICO is. And a lot of people have problems with RICO. That's right. I mean, so I think it was Salinas quoted an old Justice Holmes opinion that said A and B can conspire that C will commit a crime. And so it doesn't have to be any of these defendants. It could be other people, not even charged, who would be committing the predicate acts of racketeering. The other point I want to make is- That's where the or a conspirator- That's right. That's right. I think the or conspirator was just making clear because if you didn't have that, the jury would be told the defendant did this, the defendant did that, the defendant had this intent. And in the context of count one, the conspiracy, that's not true. That's not what the government was required to show. The defendant didn't have to do anything. The court was just saying someone in this conspiracy, the defendant or a conspirator, killed somebody, they intended to kill somebody. And that's why when you just said A and B could agree that C do something, C has to be in the conspiracy. That's right. And that's why it didn't say anybody could kill somebody. It said either the defendant or a conspirator killed somebody, intended to do so, and did so with premeditation. And so I'm not sure I see any error in those instructions. But another point is just this wasn't an issue. The government never argued anything along the lines of what I think Mr. Daley is saying now. There was never a suggestion that, oh, someone else completely offstage did these acts. The fact that we had the substantive convictions, one, proves that it was harmless, and two, shows it was never the government's theory that any of these defendants were going to be responsible for things they weren't involved with. Evidence showed each of these defendants was involved in drug trafficking in Detroit and in West Virginia. The evidence showed these defendants were involved in shootings and in killings, and each of these incidents for each of these four defendants. And so even if somehow there's a construction of the one set of elements that can be kind of backdoored into the other, it just didn't matter. It didn't matter because it wasn't an issue, and it didn't matter because the substantive offenses, there's no question when the jury convicted Corey Daley, it found he was in that car with Billy Arnold. He was serving as a lookout. He's waving the red bandana. He's there, and he was held responsible for what he did. And the same is true with respect to Mr. Porter and Mr. Brown. And so all of this, you know, holding the instructions up this close to find an issue, there's just no way that that made any difference at this trial. Unless the court has any further questions, I'm prepared to rest in a brief. Thank you, counsel. Thank you. Each of you have two minutes. Thank you. I was waiting for Mr. Hurley to say here's the case in this circuit or any other circuit or even in the DOJ manual that says this is the proper way to instruct the jury on predicate offenses. Of course, he had nothing, absolutely nothing. And when Judge Boggs referred to Salinas and referred to the words would occur, you have to take that in the context of both Salinas and Smith. Would occur means if it was followed through, there would be a 1962C offense. It doesn't mean that it has to be completed, but that it would, could be a difference. That's why the language of Salinas and Smith is so important. Salinas says if completed would satisfy all the elements of a RICO offense. And that's why Smith says sufficient to establish a 1962C violation. So, again, what they're doing is they are confabulating, putting together the You will not find anywhere under Michigan law or federal law that allows a substantive offense to be committed in the fashion that was instructed in this case. They don't exist. They're non-cognizable offenses. They're not what kind of offenses? They're not recognizable, not cognizable offenses. Recognizable, okay. I didn't hear the word. Okay. Are there any questions? Well, are you challenging any instruction on the racketeering offenses? What instruction are you challenging? Under count one. I thought you were challenging instruction number 16. Is that correct? I don't know what number 16 is, but if you, Judge Bush, if you go through, which instructions are you challenging? All of the substantive state and federal crimes, premeditated murder, robbery, obstruction, controlled substances, all of those predicate offenses, all of them, aiding and abetting and attempt, were all head that language or conspirator. You will not find anywhere under Michigan law or the federal law. So you're challenging instruction 21, racketeering activity defined? In terms of the Vicar count, yes, because the Vicar counts refer back to count one as to what constitutes racketeering activity, and that's where those definitions come from. Does that answer your question? I don't really understand your argument. I'm trying to think of other than that example that I used. You can't conspire to do something that's not illegal. You're saying that the offenses defined in that instruction do not exist? They don't exist. There's no such thing as a crime where a defendant has no intent to commit the crime, doesn't act, doesn't aid and abet, doesn't involve an attempt. And that's what the instructions were. Okay. All right. Thank you, counsel. Thank you. You know, looking at the Bremer issue, listen to the dialogue, what the court has been trying to gain here. I think if we look at this in the framework that this is a Sixth Amendment right to a fair jury trial, as a policy, I think the court should take a broad approach to particularly regarding the sanctity of the jury from being free from intrusion or outside influences. There's so much possibility, especially now with all the Internet and all the social media. So in my view, just listening to the colloquy here, we're not sure. We're looking for that bright line. What's external? What's internal? And it's a hard one to tap down. My position is if we're not sure, I think we need to err on the side of caution. If we're not sure, I think the default must be to hold a rumor hearing. That's a safe way to do it. And when I say safe, that's safe for the defendants. It's safe for the Constitution, safe for the Sixth Amendment right to a jury trial. That's going to be fair. And I think that's all we want. We're not asking for anything that is outrageous. We're asking that if anything influenced you in a way, in a manner that comes from the outside, external, that had an impact on your deliberations. If the answer is no, then okay, no harm, no foul. If the answer is yes, then we have a problem. And so the judge, at the very least, should have done the inquiry. What would have been the big deal? I mean, it wouldn't have taken long. In terms of judicial expediency, yeah, it might have been an hour or two hour hearing. I don't know how long it would have been. But at this point, you know, we don't have the answers to some of the questions that the court wants to know. Did you ask? I mean, the government says, look, when all this was going on, they didn't ask. We did ask. As soon as we knew about it. This is how we even found out about it. He said they brought it up during deliberations and no one asked. We found out about it by happenstance. Keith Spiegelfogel went in to say goodbye. He was one of the learned counsel. Towards the end of the trial, he was going to say goodbye to the judge. And then he mentioned it to the judge. And then Keith said, well, we better convene a hearing here. So when he found out about it, then the government asked for the report. We didn't get the report until after the jury read it. But that's on the record that he requested a hearing. We filed a motion for a hearing. While the jury was still in panel. No, because we didn't even have the report at that point. We didn't have the report from the supervising marshal at that point. We didn't even know about some of the events until afterwards. And so, no, the conference was on the 23rd. The marshal's formal report wasn't until later. But people could have done whatever they could have done in that conference on the 23rd. Do I have the dates right? I agree with you, Judge. It was on the 27th. Hindsight is 20-20. In real time, we didn't know about how the jury got the marshal's number and about the threats. We didn't know about a lot of that. And it took a minute to just organize. And as soon as we got that together, we filed the motion. And it still wouldn't have been too late. The jury was still available. This was just days or weeks afterwards. So it wasn't like now. We've got three years later. That's a problem. What's the remedy? But at the very least, there should be a hearing. Maybe it's a moot hearing. Maybe there should be a new trial. The options are open. Anything further? Thank you, Counselor. Thank you, Judge. Let's see. It's one thing when a witness comes on the stand and testifies we got a search warrant and items 1 through 10 are what we seized. It's another for a witness to come on and say we seized items 1 through 10. And here's 1. Look at 1. 1 means this person is dropping 4s and that's a gang symbol. 2 is a 7. 7 is 7-mile bloods. Oh, this is on Robert Brown's Facebook page, by the way. I think the government is naive to think that the jury didn't get what they were doing. And what they were doing is sliding in an expert as a fact witness. And I apologize to Mr. Hurley if I misheard him, but I thought he said we didn't put this in, the qualifications in, because there's no objection. Well, first of all, I think Shy did object. I know the court had questions about that, but said no interpretations. It's not proper. Interpretation to me means opinion. He can't get into your opinions. Should it have been done a longer hearing? Yes. But I think there was an objection. But if the government is saying there was no objection, I would suggest they were trying to slide it in under the radar. Let's get all the testimony in without having to subject my guy, Ruiz, to a hearing on whether he's really qualified, because he's not. He's not qualified. There's no evidence in this record that he has the kind of expertise to direct a verdict against our clients. And that's what happened in this case, and it's regrettable and it's plain error. Thank you. Thank you, counsel. You may proceed. Thank you. Counsel said that Derek Kennedy – I'm sorry – said that Keith-on-Porter did not get swept up because he's in a cell phone video. The cell phone video that Keith-on-Porter is in is at a birthday party. Most of the young men that come from an impoverished community think the way to get out is to rap. So Keith-on-Porter was a rapper. But, again, Derek Kennedy, who testified that Keith-on-Porter was not a part of the SMBs or any of the subsidiaries or associate of the SMBs, he does have one video that Keith-on-Porter is in, and that video is at a birthday party where he is rapping. We may mention to Keith-on-Porter – I mean, to KP. KP is not in – KP is in Corey Bailey's phone. Corey Bailey does not know Keith-on-Porter. Counsel also said it could have been PK, reversed. Again, Keith-on-Porter – or KP was attributed to Eugene Fisher's phone. None of these people are known by Keith-on-Porter. I believe that Derek Kennedy would say anything when he says that my client told him he murdered somebody. I think that Derek Kennedy is a paid informant and just says whatever he needs to say to get out of trouble. I think Officer Ruiz wasn't – it wasn't a mistake or a good faith mistake. I think Detective Ruiz, when he did the control buy, he had access to the phone that was on Keith-on-Porter. That was the phone that he was texting him. They did not admit the phone that they actually had from Keith-on-Porter. Matter of fact, they didn't even download it. I think they just attribute the cell phone records to Keith-on-Porter because it says KP. But the phone that was on Keith-on-Porter was never admitted, and the cell phone records should not have been admitted. Thank you. Thank you, Counsel. Thank you all very much for your thoughtful argument. Thank you to the attorneys who participated by the CJA. We much appreciate it, and the case will be submitted. Please call the next case.